**UNITED STATES of America, Appellee,**

v.

**Gale NACE and Nathan J. Warren, Sr., Appellants.**

**UNITED STATES of America, Appellee,**

v.

**Ned WARREN, Sr., and Gale Nace, Appellants.**

**Nos. 76–1794, 75–3183 and 75–3509.**

United States Court of Appeals, Ninth Circuit.

Sept. 21, 1977.

Rehearing and Rehearing En Banc Denied Nov. 8, 1977.

---

Jordan L. Green, of Debus, Busby & Green Ltd., Phoenix, Ariz., John J. Flynn, of Flynn, Kimerer, Thinnes, Derrick & Lindholm, Phoenix, Ariz., argued for appellants.

Michael B. Scott, Asst. U. S. Atty., Phoenix, Ariz., Kevin F. O'Malley, Sp. Atty., Los Angeles, Cal., argued for appellee.

Before ELY, GOODWIN and ANDERSON, Circuit Judges.

## OPINION

GOODWIN, Circuit Judge:

Gale Nace and Nathan Warren, Sr., appeal their convictions under 18 U.S.C. § 894 for using extortionate means to collect an extension of credit. The separate appeals have been consolidated because of the similarity of many of the issues.

This prosecution grew out of alleged threats made by Warren and Nace in their attempt to collect a loan from Edward Dennis Kelly. The record shows that Kelly and Warren were associated in several business ventures. They agreed to acquire and jointly manage several bars through corporate entities. After the bars were acquired, Kelly informed Warren that the operations needed an $8,000 loan. Warren arranged for Kelly to borrow $8,000 from Nace. On August 29, 1973, Nace advanced the funds to Kelly in exchange for a promissory note and a security interest in certain liquor licenses.

Kelly and Warren sold two of the bars. While awaiting the receipts from the sales, Kelly suspended payment on the $8,000 loan. Nace demanded his money and told Kelly that he was not concerned with Kelly's arrangements with Warren. During the second week in October, 1973, Nace approached Kelly and told him that if he did not pay Nace could have an arm broken for $50, two arms broken for $100, two arms and a leg broken for $150, and for $200 he could get the whole package done. Nace also stated that "People who don't pay, don't last long."

Kelly informed Warren of these threats but Warren stated that Kelly should take up the matter with Nace. A few days later, Kelly, accompanied by his bodyguard, met with Warren. As he was leaving Warren's office, Kelly was confronted by Nace, who told him that this was a syndicate now, it wasn't the little league, and Kelly would pay.

A month later, Warren called Kelly and demanded payment on the balance of the $8,000 note. When Kelly did not comply, Warren again called him and said: "If you don't, I would hate to pay the consequences." The following day Kelly received several phone calls from both Warren and Nace.

Kelly then contacted the police and allowed them to record a subsequent meeting he had with Warren and Nace. During that conversation Warren said: "I happen to like you or I would've broken your neck because I've been cheated on the whole deal." When Nace entered, Warren stated: "He just walked in here saying he's not paying you Gale." Nace replied, "I don't care, I have a bad deal, and its bad; I'll

guarantee you I'll put you in the hospital for 8 grand, it will cost you that."

In October of 1974, Kelly, accompanied by two friends, again went to Warren's office. Warren confronted them with a tape recorder and Kelly stated on the tape that Warren had never threatened him.

The investigation continued for another year. On November 13, 1974, a three-count indictment was returned against Nace. On June 11, 1975, a superseding indictment was filed against Nace and Warren. After a jury trial, Warren and Nace were convicted on all counts charged.

Appellants argue first for a new trial, claiming that the prosecution violated Fed.R.Evid. 103(c) by introducing prejudicial, nonadmissible evidence in front of the jury. Specifically, appellants accuse the prosecution of improperly asking a question that would plant in the jury's mind the suggestion of a syndicate murder "contract".

References to "syndicate" operations surfaced several times during the trial. The issue first arose at pretrial when appellants made a motion to dismiss the indictment because, they argued, the Extortionate Credit Transactions Act, 18 U.S.C. § 891 *et seq.*, applied only to organized crime and to those seeking to enforce debts which had their origins in illegal activity. Warren and Nace argued that the government's evidence showed only threats between two legitimate businessmen.

While the government always contended that Warren and Nace were involved in organized crime, it had little proof. The prosecution argued at pretrial that 18 U.S.C. § 894 covered any attempt to collect a debt by extortionate means. The trial court reserved its ruling on this motion.

Reference to the "syndicate" next surfaced when Kelly, the victim of the alleged extortion, testified that appellant Nace had told him that "this was a syndicate now and it wasn't little league and I would pay."

During the defense case-in-chief, appellant Warren testified that he had no connections with the so-called syndicate, the Costra Nostra, or Mafia.

His cross examination produced the following:

"Q: Mr. Warren, Mr. Flynn asked you, I believe during your direct examination, if you had any association with the Mafia or the Cosa Nostra or the syndicate and you answered—no—?

A: That's correct.

Q: Did you ever tell Dennis Kelly that you had any such connections?

A: No, never.

Q: Have you ever told any one that you placed a contract with any such organization?

A: What do you mean?

Q: Did you ever tell any one that you had placed a $5,000 contract with the people in Detroit or Chicago?

A: I don't know people in Detroit or Chicago.

Q: Did you ever make that statement?

A: No.

Q: Do you know Mr. Richard Frost?

A: Yes, sir.

Q: Did you ever tell Mr. Frost that you lost $5,000 to people in Chicago because—

A: —No, I don't even know anybody in Chicago, to the best of my knowledge.

Q: The question, sir, is —did you ever tell Mr. Frost that you lost $5,000 because you placed a contract with people in Chicago to kill Mr. Frost?

[Defense Counsel]: I'm going to object, if the Court please, because it is entirely immaterial and highly prejudicial.

[Prosecutor]: Well, if your Honor please,—

[Defense counsel]: —Just a moment, please, if I may have the Court's ruling on that.

THE COURT: Well, the Court is inclined to sustain your objection unless you will avow that you have evidence to that effect.

[Prosecutor]: I will go forward, if your Honor please.

THE COURT: You will have someone to testify to that?

[Prosecutor]: Yes, your Honor.

[Defense counsel]: At this moment, I would request a hearing in the absence of the Jury on this particular matter.

[Prosecutor]: Your Honor, I will avow to the Court that I have evidence that will impeach this witness's testimony as to placing the contract and I see no reason to go into any thing out of the presence of the Jury.

THE COURT: Well, I'd better hear your offer of proof. Members of the Jury, you will now take a short recess and bear in mind the Court's admonition given to you before and with respect to matters such as these, you are not to give any weight to any testimony until it may be repeated. In other words, just disregard any question until the Court makes its decision and otherwise advises you. You may now be excused."

The court then heard argument and determined to hear an offer of proof at a later time that day. The jury returned and was again admonished to disregard the question and the avowal unless it received further instructions from the court.

Later that day the court heard the testimony of Richard Frost. Frost stated that Warren had told him that he (Warren) had put out a syndicate contract on Frost. The court excluded this testimony, saying that it would unduly prejudice Nace. (The court did not express its view on the admissibility of the testimony as to Warren.)

At this juncture, counsel for Warren requested that the jury be further admonished; counsel for Nace requested a mistrial. The court did not further admonish the jury that day and the mistrial motion was denied. The next morning, counsel for Warren moved for a mistrial on the grounds that a curative instruction at that time could not erase the error. The court denied the motion for a mistrial but it fur-

ther cautioned the jury. Once again, in its general instructions to the jury at the close of the trial, the court told the jury to disregard any evidence which had been disallowed by the court.

The case was tried shortly after the effective date of the Federal Rules of Evidence. While the Frost transaction was arguably admissible under Rule 404(b) as to Warren, it was arguably inadmissible under Rule 403 as to Nace. The government can argue that the cautionary instructions, running as they did in favor of both defendants, gave Warren more than he was entitled to, and Nace can argue that the cautionary instructions gave him less, as they merely attempted to "unring a bell" to his real or imaginary prejudice. In the context in which the matter was presented to the court, however, the cautionary instructions were, if not perfect, adequate.

The defense opened this line of questioning on direct examination. Warren's testimony that he had no Mafia connections was an invitation to vigorous cross-examination. Although the prosecutor should have broached the impeachment material outside of the jury's presence as it did other dangerous evidentiary matters, we cannot say that its failure to do so constituted that kind of misconduct which requires reversal.

Unlike many of the cases cited by appellants, the government in this case had evidence to support its allegations. *Compare United States v. Rudolph*, 403 F.2d 805 (6th Cir. 1968); *Thurman v. United States*, 316 F.2d 205 (9th Cir. 1963). Furthermore, the defendants made the existence of Mafia-type connections relevant to the ultimate issue in this case by contending that 18 U.S.C. § 894 covered only organized crime. Also, the question of appellants' representation about their connections with the syndicate is relevant to the issue of Kelly's fear. Such fear is an essential element of the crime charged. 18 U.S.C. §§ 894, 891(7); *United States v. Curcio*, 310 F.Supp. 351 (D.Conn.1970).

The trial court is in the best position to decide whether a given incident merits a mistrial. *United States v. Love*, 535 F.2d

.1152 (9th Cir.), *cert. denied*, 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976); *United States v. Short*, 500 F.2d 676, 677 (9th Cir.), *cert. denied*, 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974); *United States v. Faulkenbery*, 472 F.2d 879, 882 (9th Cir.), *cert. denied*, 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692 (1973). This entire interchange consumed three° pages of a 1680-page trial record. The exchange did not so pervade the trial with prejudice so as to constitute an unfair trial. *United States v. Fernandez*, 497 F.2d 730, 735 (9th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1975); *Smith v. United States*, 305 F.2d 197, 205 (9th Cir.), *cert. denied*, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962). A more timely objection would have substantially decreased any amount of prejudice that did occur.

In light of these factors and the four curative instructions that were given by the trial court, *United States v. Gomez*, 523 F.2d 185 (9th Cir. 1975), *cert. denied*, 423 U.S. 1075, 96 S.Ct. 859, 47 L.Ed.2d 85 (1976); *United States v. Bashaw*, 509 F.2d 1204 (9th Cir. 1975), the denial of the motion for a mistrial was not error.

■ Appellants next contend that reversal is required because the trial court erred in admitting evidence of threats that were not charged in the indictment. These alleged threats were made to witness Abidin by Warren's son (not a party) at the direction of appellant Warren.

Appellants concede that under 18 U.S.C. § 894(b) evidence of prior attempts to collect extensions of credit by extortionate means are admissible for the purpose of showing the victim's state of mind, if the fact of the prior attempts has been communicated to the victim. Appellants do not deny that Warren, as creditor, "extended credit" to Abidin as that term is used in the statute. They argue, however, that the prior threat in this case did not involve an attempt to collect on that extension of credit, and that § 894(b) is not applicable.

Abidin purchased a restaurant from Investors Realty, a corporation controlled by appellant Warren. Disputes concerning various aspects of this sale arose immediately. When Abidin missed his first mortgage payment, Warren contacted him and demanded his money. Abidin responded that the restaurant was not making money and that he could not make the payments. When Warren persisted, Abidin threatened to turn the entire matter over to the authorities.

Later, at a meeting at which victim Kelly was present, appellant Warren directed his son, Warren Jr., to "straighten out the Arab." At the resulting meeting between Junior and Abidin, Junior told Abidin, "We have enough money to bury you and eliminate you." Abidin told Kelly about this threat.

There was a sufficient showing of an extortionate attempt to collect on an extension of credit in Abidin's encounter with Warren to make Abidin's testimony admissible under 18 U.S.C. § 894(b). The trial court properly instructed the jury that the testimony of Abidin was to be considered only for the purpose of showing the victim's state of mind and the motive and intent of defendant Warren.

■ The court specifically instructed the jury that the testimony of Abidin was applicable only to Warren. Nevertheless, appellant Nace argues that he was unduly prejudiced and that the trial court erred by not granting a severance.

There is a substantial public interest in joint trials of persons charged together with committing the same offense. *Parker v. United States*, 404 F.2d 1193 (9th Cir. 1968), *cert. denied*, 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969); *Bayless v. United States*, 381 F.2d 67 (9th Cir. 1967). Once the defendants are properly joined, the denial of a severance motion will not be overruled without a showing of clear prejudice. *United States v. Martinez-Villanueva*, 463 F.2d 1336 (9th Cir.), *cert. denied*, 409 U.S. 915, 93 S.Ct. 236, 34 L.Ed.2d 177 (1972). *See Davenport v. United States*, 260 F.2d 591 (9th Cir. 1958), *cert. denied*, 359 U.S. 909, 79 S.Ct. 585, 3 L.Ed.2d 573 (1959). The fact that evidence may be admissible

against only one of two defendants does not constitute such prejudice as to require separate trials. *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Hoffa*, 349 F.2d 20, 43 (6th Cir. 1965), *affirmed on other grounds, Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). There was no abuse of discretion.

■ Appellants' third claim of error is that the trial court improperly excluded certain testimony of witness Phillips. The testimony of Phillips, a creditor of Kelly, was designed to impeach Kelly and to show that Kelly lived in fear before any threats were made by Warren and Nace.

On cross-examination, Kelly was asked if any other creditors were threatening him or harassing him. Kelly denied such threats. On re-direct he defined a threat as someone stating they would "physically beat you up or harm you." During the defense case, Phillips testified that he had trouble collecting a debt from Kelly and that Kelly had a bodyguard before he received any threats from appellants.

After an objection and an offer of proof, the court excluded additional testimony to the effect that Phillips made more attempts to collect payment; that Phillips went to Kelly's residence and was threatened by Kelly; and that, on one occasion, Phillips saw Kelly's bodyguard with a gun. Appellants contend that this testimony was relevant and was proper impeachment of Kelly.

The excluded portion of the Phillips testimony was not material to the case. Contrary to the assertions of the appellants, the excluded testimony did not show that Kelly was put in fear by Phillips. The excluded testimony did arguably impeach Kelly's testimony that he was not harassed by other creditors. However, as there was no testimony that Phillips threatened Kelly, this impeachment was on a collateral matter and was properly excluded in the discretion of the trial court. *United States v. Carrion*, 463 F.2d 704 (9th Cir. 1972); *Lenske v. Knutsen*, 410 F.2d 583 (9th Cir. 1969); *Ramirez v. United States*, 294 F.2d 277 (9th Cir. 1961).

■ Appellants also complain of the prosecutor's closing argument, in which he stated: " * * * you didn't hear any evidence in this case that Dennis Kelly had the reputation for carrying a gun with him all of the time prior to these incidents. I submit that had there been any such evidence you would have heard of it". This comment was proper. It did not involve privileged testimony (*see United States v. Grammer*, 513 F.2d 673 (9th Cir. 1975); *Ignacio v. People of Guam*, 413 F.2d 513, 531 (9th Cir. 1969), *cert. denied*, 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970)), or a comment upon excluded evidence. There was no error.

■ Appellant Nace claims that the trial court erred in submitting the case to the jury, because there was no evidentiary basis for the charge in the indictment that an extension of credit was made to Kelly. Although Nace couches his argument in terms of variance, it is in substance a claim that the evidence was insufficient.

Nace bases his contention on the cross-examination testimony of Kelly in which Kelly denied any personal liability on the $8,000 loan. However, other evidence in the record contradicts that testimony. For example, Kelly personally signed two promissory notes; Kelly listed the loan as a personal obligation on his bankruptcy petition; and the appellants pressured Kelly personally to repay the loan.

Under the Extortionate Credit Transactions Act, it is not necessary to prove that the alleged debtor admitted his liability for an obligation or that the existence of the debt was undisputed. 18 U.S.C. § 891(1) and (4). As the trial court correctly stated: "A creditor who has used extortionate means to collect money which he claims was owing him cannot derail a prosecution under 18 U.S.C. § 894 by asserting as a legal proposition that the claim was not collectible from the individual whom the creditor threatened. *United States v. Briola*, 465 F.2d 1018 (10th Cir. 1972), *cert. denied*, 409 U.S. 1108 [93 S.Ct. 908, 34 L.Ed.2d 688] (1973)." There was sufficient evidence in

the record to support the finding that an extension of credit had occurred. There was no error.

■■■■ Nace next argues that the trial court erred in instructing the jury that under the statute a debtor "means any individual who guarantees the repayment of any extension of credit whether in a corporate or personal capacity." Nace contends that this instruction injected an issue into the trial which was not charged in the indictment. Defendants made no objection at trial to the form of this instruction. Therefore, unless the instruction constituted "plain error", it cannot be challenged on appeal. *Egger v. United States*, 509 F.2d 745 (9th Cir.), *cert. denied* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 61 (1975); *United States v. Carey*, 475 F.2d 1019 (9th Cir. 1973); Fed.R.Crim.P. 30.

The grand jury charged Warren and Nace with the use of extortionate means to collect an extension of credit from Edward Dennis Kelly in violation of 18 U.S.C. § 894. Under the statute, "[t]he term 'debtor', with reference to any given extension of credit, refers to any person to whom that extension of credit is made, or to any person who guarantees the repayment of that extension of credit." 18 U.S.C. § 891(3). Although the instruction given in this case is not as clear as it could be, it substantially comports with the statutory definition of "debtor". We find that this instruction did not create a variance and was not in error.

■■■ Appellant Warren argues that the trial court erred in excluding Kelly's prior sworn statement in his bankruptcy proceedings. This attempt at impeachment was on a collateral matter not related to the alleged extortion. The trial court neither erred nor abused its discretion in excluding it. *Lenske v. Knutsen, supra.*

■■■ Warren next claims that the trial court erred by excluding a tape recording for lack of foundation. This recording, which Warren attempted to introduce during his cross-examination of Kelly, contained a conversation between appellant Warren and Kelly. Warren argues that the court's ruling denied him the right of effective cross-examination.

It appears that the trial court did err in excluding the tape. Although Kelly did not have custody of the tape, he was present at the time it was recorded, he identified it, and acknowledged that it was accurate except for a small deletion at the end. This is all that is required to lay an adequate foundation. *United States v. Cosby*, 500 F.2d 405 (9th Cir. 1974).

We find, however, that the error was both harmless and cured. The defense counsel was allowed to use the tape transcripts in their cross-examination of Kelly. Furthermore, the entire tape was played for the jury later in the trial.

■■■ Appellant Warren's third assignment of error is that the court improperly admitted the testimony of two witnesses concerning Warren's reputation in the community for truth and veracity. Because appellant Warren testified on his own behalf, such impeachment testimony was proper. *Hodge v. United States*, 414 F.2d 1040 (9th Cir. 1969).

The record shows that witness Babbitt and witness Simmons had an adequate opportunity to ascertain Warren's community reputation for truth and veracity. Babbitt lived in the same community as Warren for eight years, and Simmons lived in the same community for twenty-five years. Both testified that, based upon their community contacts, they were able to form an opinion of Warren's reputation for truth and veracity. An adequate foundation having been laid, this testimony was properly admitted under Fed.R.Evid. 608(a).

■■■ Defendants argue that they were precluded from effectively cross-examining the witnesses on the basis of their opinions. The defendants, who theorized that the opinions of Babbitt and Simmons were based upon media reports, did not pursue that line of cross-examination because they feared it would impress the jury with the defendants' notoriety. This was a tactical decision which does not reflect upon the admissibility of the reputation testimony.

■ Appellants further contend that they were precluded from offering conflicting testimony because of the court's ruling that the prosecution would be entitled to ask the witnesses if they had heard of any prior convictions of Warren. This ruling is specifically authorized by *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), and was recently approved in *United States v. Bermudez*, 526 F.2d 89 (2d Cir. 1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). The court clearly did not abuse its discretionary power to define the scope of cross-examination. *Egger v. United States, supra.*

Warren and Nace have also appealed from the trial court's denial of their motion for a new trial. This motion was based both upon newly discovered evidence and upon an alleged governmental suppression of exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Warren and Nace submitted to the district court three affidavits which stated in effect that Kelly had told the affiants that he was not afraid of Warren, but instead was out to "get" him by means of this prosecution. One of these posttrial affiants, Rhonda Walden, stated that Kelly had asked her to lie on the witness stand in order to help him "screw" Warren. Walden further stated that she related Kelly's request to the prosecutors in this case. Walden's affidavit forms the basis for appellants' *Brady* claim.

In response, the government filed Kelly's affidavit in which he denied making any of the statements attributed to him in the appellants' affidavits. The government filed four other affidavits in response to the allegation that it suppressed evidence of Kelly's subornation of perjury. United States Attorney Scott stated that he could not recall any such statement by Walden. Assistant U.S. Attorney O'Malley and F.B.I. Agent Brown, who were also present at the Walden interview, both denied hearing Walden make the statement. Assistant U.S. Attorney Jennings, who was cocounsel for the prosecution, stated that he had never heard his fellow prosecutors discuss the Walden-Kelly evidence.

After reviewing these affidavits, the trial court denied the motions for a new trial. There was no error.

■ Appellants are incorrect in their assertion that the trial court should have held a hearing on their motion. The decision on whether to hold a hearing or to proceed by affidavit is within the sound discretion of the trial court. *United States v. Scott*, 521 F.2d 1188 (9th Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976); *United States v. Thompson*, 493 F.2d 305, 310 (9th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). In this case, it was proper to proceed with affidavits. There was no abuse of discretion.

■ Nor did the trial court err in denying appellant's new-trial motion based upon newly discovered evidence. This newly discovered evidence merely provided further impeachment of Kelly. This is not an adequate basis for the grant of a new trial. *United States v. Harris*, 534 F.2d 1371, 1374 (9th Cir.), *cert. denied*, 429 U.S. 847, 97 S.Ct. 132, 50 L.Ed.2d 120 (1976); *United States v. Colacurcio*, 499 F.2d 1401 (9th Cir. 1974); *Lindsey v. United States*, 368 F.2d 633 (9th Cir. 1966), *cert. denied*, 386 U.S. 1025, 87 S.Ct. 1383, 18 L.Ed.2d 465 (1967).

Furthermore, the trial court found that counsel did not exercise due diligence in discovering the so-called new evidence. A showing of due diligence is a condition for the granting of a new trial because of newly discovered evidence. *United States v. Carey, supra ; Lindsey v. United States, supra.* The trial court did not abuse its discretion in denying the Rule 33 motion.

■ Finally, we find no error in the court's rejection of appellants' *Brady* claim. After reviewing the affidavits, the court found: " * * * The prosecution had no knowledge of the statement, allegedly made by Kelly to Walden, either prior to the trial or at any time prior to the filing of the motion at hand. Thus there was no *Brady* violation."

This finding of the trial court is entitled to great deference and we cannot overturn it unless it clearly appears that it is not supported by evidence. *United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946); *Prlia v. United States*, 279 F.2d 407 (9th Cir. 1960). There was sufficient evidence to support the findings.

Affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent. Because of the grossly inflammatory and prejudicial evidence unlawfully injected by the prosecution near the end of a bitterly contested trial, the conviction should be reversed.

Although there is no "litmus-paper" test for determining whether a new trial should be granted when the prosecution interjects evidence that is inadmissible and prejudicial to the accused, the courts have considered a number of factors. These include the inherent prejudice of the evidence presented, the forcefulness and timeliness of the trial court's curative instructions, and the overall strength of the prosecution's case. *See United States v. Martinez*, 514 F.2d 334 (9th Cir. 1975); *United States v. Bashaw*, 509 F.2d 1204 (9th Cir. 1975); *Thurman v. United States*, 316 F.2d 205 (9th Cir. 1963).

It is difficult for me to conceive of more inherently prejudicial evidence than a showing that an accused has placed a murder contract with the "Mafia." The law is particularly protective of one accused of murder and underworld taint. *See United States v. Love*, 534 F.2d 87 (6th Cir. 1976) (conviction reversed because the defendant was asked if he was part of another organization of "ill character like the Mafia or anything like that"); *United States v. Gray*, 468 F.2d 257 (3d Cir. 1971) (en banc) (conviction reversed under "plain error" doctrine because the prosecution asked the accused if he had killed his wife, an offense for which he was not on trial); *United States v. Rudolph*, 403 F.2d 805 (6th Cir. 1968) (conviction reversed because the defendant was asked if he had solicited murder of a prosecution witness).

Rather than curing the prejudice to the defendants, the actions of the trial court may well have aggravated the unfairness of the trial in the present case. The court did not immediately excuse the jury so as to assess the impact of the prosecutor's question. Instead, the judge asked the prosecutor to avow in the presence of the jury that he, the prosecutor, would present evidence confirming that Warren placed the alleged murder contract. Defense counsel then vainly attempted to have the jury removed, but the prosecutor immediately responded with an avowal that he would present the severely prejudicial evidence.

After thus allowing the reputation of the Justice Department to be indelibly and irretrievably placed behind the sordid accusations, the trial court dismissed the jury with the request that it not give the testimony any weight "until it may be repeated." After discussing the matter with the attorneys, the jury was returned and instructed to disregard the evidence "unless for some reason or other it should come in at a later date." Finally, after a delay of a day and a half, the trial court ruled the testimony inadmissible and instructed the jury, *immediately before argument*, to disregard the question.

This was by no means a case in which the evidence of guilt was overwhelming. The jury deliberated for two and one half days, and relatively insignificant matters may have been sufficient to alter the outcome. Considering the highly inflammatory nature and impact of the improper question, the tardiness and timidity of the curative instructions, and the length of the jury's deliberations, I deplore the failure of my Brothers to conclude that reversal is required.