UNITED STATES of America,
Plaintiff-Appellee,

v.

Allan FRIEDMAN, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert John McCOY,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Douglas Robert JOHNSON,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert Francis GARRITY,
Defendant-Appellant.

Nos. 77–2131, 77–2148, 77–2208 and 77–2155.

United States Court of Appeals,
Ninth Circuit.

March 15, 1979.

Joel Benoliel (argued), of MacDonald, Hoague & Bayless, Seattle, Wash., Murray P. Guterson (argued), of Guterson & Grader, Seattle, Wash., Laurence B. Finegold (argued), of Franco, Asia Bensussen, Coe & Finegold, Seattle, Wash., Victor Sherman (argued), of Nasatir, Sherman & Hirsch, Los Angeles, Cal., for defendants-appellants.

J. Ronald Sim, Asst. U. S. Atty. (argued), Seattle, Wash., for plaintiff-appellee.

Before ANDERSON and HUG, Circuit Judges, and MUECKE *, District Judge.

HUG, Circuit Judge:

Allan Friedman, Robert McCoy, Douglas Johnson and Robert Garrity each appeals his conviction on one count of conspiracy to import cocaine, in violation of 21 U.S.C. § 963, and two counts of importation of cocaine, in violation of 21 U.S.C. §§ 952, 960. The appellants raise various questions concerning the sufficiency of the evidence to support the convictions, the admissibility of certain evidence introduced by the Government and the scope of the Government's duty to disclose information to the defense. We affirm.

*FACTS*

The evidence introduced by the Government showed a series of drug purchases by a group of Americans from a Chilean dealer named Torres-Romero. The most important witnesses for the Government were Juan Mardones, a Chilean attorney who worked for Torres-Romero, and Ronald Ossenberg, one of the American buyers.

All of the transactions described below established the existence of a conspiracy and the appellants' involvement in that conspiracy. In addition, two cocaine shipments arranged by Ossenberg formed the basis for the substantive counts of importation on which all appellants were convicted.

I.

*April, 1972 Meeting*

At the trial, Mardones described a meeting between Torres-Romero and two Americans who wished to establish a cocaine-dealing relationship:

The meeting took place in April, 1972, at a club in Chile. Mardones attended and

---

* The Honorable C. A. Muecke, United States District Judge for the District of Arizona, sitting by designation.

acted as the interpreter. Two Chileans, a man named Price-Salcido and a woman named Aguayo accompanied Torres-Romero and Mardones. The two Americans at the meeting were Tom Vinje and appellant Allan Friedman. Tom Vinje, who was a key figure in the American group, died in Chile in 1973.

Vinje and Friedman told the Chileans that they wished to purchase a sample of cocaine on behalf of a prospective financier in Seattle and if the cocaine was satisfactory, further purchases would be arranged. The Americans said that they planned to smuggle the cocaine into the United States in hollow water skis.

Both Vinje and Friedman were provided with a small amount of cocaine at the meeting; each tested the drug in various ways and commented favorably on its quality. In anticipation of future dealings, the parties agreed that the next visitor from the American group would send a cable to Mardones, announcing his impending arrival, and would identify himself by wearing a certain cowboy hat that Vinje had purchased in Chile.

The April meeting led to the sale of a one-kilogram sample of cocaine to the Americans. A few days later, Mardones received a cable stating that "the hat" had arrived safely in the United States.

Aguayo and Price-Salcido also testified at the trial, partially corroborating Mardones's account of the April meeting. Neither Aguayo nor Price-Salcido could identify Friedman in court; however, both testified that one of the Americans at the April meeting was named "Allan". Price-Salcido testified that Mardones's reputation for truth and veracity was "the worst anyone can have".

## II.

### *Subsequent Transactions*

Mardones testified to a series of transactions that followed the April meeting:

In June, 1972, Vinje traveled to Chile and purchased two kilograms of cocaine from Torres-Romero for $16,000. Although Vinje brought hollow water skis in which to carry the cocaine, the Chileans persuaded Vinje to hide the contraband in hollow wall plaques.

In July, 1972, Mardones received a cable subscribed with the name of appellant McCoy and announcing a visit from "the hat". On his arrival in Chile, McCoy paid the Chileans the $3,000 owed from the initial purchase in April and purchased an additional four kilograms of cocaine, which was smuggled into the United States in hollow wall plaques. McCoy advised the Chileans that the next visitor would be "the snake".

In August, 1972, Mardones received a cable subscribed with the name of appellant Garrity, again announcing the arrival of "the hat". The Chileans found Garrity registered at a Chilean hotel as "Mr. Snake". Garrity was forced to send for additional funds from the United States, because Torres-Romero refused to extend partial credit to Garrity on the sale of four kilograms of cocaine. Appellant Johnson arrived with the additional money, and the sale was made. In the presence of Mardones, Johnson and Garrity engaged in a conversation in which they expressed their displeasure with one "O'Brien", who they said was taking excessive profit in light of his role as financier. Johnson stated that their regular money source had failed them and that the additional funds had been supplied by McCoy. The cocaine was smuggled in hollow wall plaques.

In June, 1973, Johnson and McCoy traveled to Chile and purchased about ten kilograms of cocaine. The cocaine was smuggled into the United States in specially-made suitcases.

## III.

### *Substantive Counts of Importation*

Ossenberg testified to two transactions that formed the basis for the substantive counts for illegal importation of cocaine:

Ossenberg was the executive vice-president of the O'Brien Water Ski Company.

Herbert O'Brien, convicted in this case, but not a party to this appeal, was the president of the company. Late in 1972, O'Brien advised Ossenberg that the company was in financial straits. As a solution, O'Brien proposed that Ossenberg purchase cocaine in Chile and ship it to the United States in hollow water skis. Ossenberg flew to Chile in December, 1972 with $43,000 and instructions from O'Brien to meet Vinje in Chile. Vinje, McCoy and Mardones met Ossenberg at the airport in Chile. Ossenberg later met with Torres-Romero and purchased eighteen kilograms of cocaine. Ossenberg, McCoy, Vinje and Mardones worked together to pack the cocaine into the hollow skis. The skis were transported to the O'Brien Company in Seattle where Ossenberg, Vinje and McCoy unpacked the cocaine. Vinje and McCoy took the cocaine out of the factory.

In 1973, O'Brien directed Ossenberg to make another trip to Chile for cocaine. Ossenberg flew to Chile in September with $55,000 and more hollow skis. He purchased twenty-four kilograms of cocaine from Torres-Romero and shipped the cocaine in the same manner as he had in the previous transaction. At the O'Brien Company factory, Ossenberg emptied the skis and gave the cocaine to McCoy.

Ossenberg testified that he viewed each of the above transactions as isolated events, unrelated to prior or subsequent transactions. However, he also testified that he discussed future dealings with Torres-Romero on each occasion.

Mardones's testimony generally corroborated Ossenberg's account of the two transactions described above. Mardones added that Vinje had remarked in December, 1972 that Vinje, McCoy, Garrity and Johnson had merged their efforts with those of O'Brien and Ossenberg.

## IV.

### Corroborative Evidence of Presence in Chile

Friedman and McCoy surrendered their passports as a condition to pre-trial bail. The passports were admitted into evidence to show that Friedman and McCoy had traveled to Chile at relevant times. Four Chilean hotel records were admitted for the same purpose.

The Government sought unsuccessfully to obtain official Chilean immigration records that would show that McCoy, Garrity and Johnson entered and exited Chile at relevant times. The Government was able to obtain only a letter, or letters, signed by a high Chilean official who was not the custodian of the records. We will refer to the letters as the "travel documents". The Chilean official asserted in the travel documents that he had inspected the records and that the records confirmed the visits of the three appellants. The signature on the documents was authenticated by an American consular official. The trial court initially refused to admit the documents into evidence and instructed the Government to continue its efforts to obtain the actual records. On the last day of trial, when it was clear that the original records would not be available, the court admitted the travel documents into evidence under Fed. R.Evid. 803(24), the "catch-all" exception to the hearsay rule.

## ISSUES PRESENTED FOR REVIEW

Each appellant raises a number of contentions. The major issues are:

1. Whether the convictions are supported by the evidence;

2. Whether the district court erred in admitting documentary evidence of the appellants' presence in Chile;

3. Whether Johnson was denied a fair trial due to the Government's failure to disclose certain information to Johnson's counsel; and

4. Whether the admission of allegedly unduly prejudicial testimony should have resulted in a mistrial.

## DISCUSSION

### I.

### Sufficiency of the Evidence

We are called upon to decide whether the evidence supports the findings of the jury

that: (1) Friedman, Garrity and Johnson were members of a conspiracy to import cocaine; (2) the appellants participated in the single, continuing conspiracy charged in the indictment, rather than two separate conspiracies; and (3) Johnson and Garrity were guilty of importation of cocaine.

■ In addressing these questions, we must view the evidence in the light most favorable to the Government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The verdict of the jury will be upheld if there was relevant evidence from which the jury could reasonably have found the defendant guilty beyond a reasonable doubt. *See United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977).

### A. Participation in the Conspiracy

■ The Government had the burden of proving beyond a reasonable doubt that the conspiracy did exist and that each defendant was a member of the conspiracy charged. *United States v. Peterson*, 549 F.2d 654, 657 (9th Cir. 1977).

■ Conspiracy is established when there is an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense. *United States v. Oropeza*, 564 F.2d 316, 321 (9th Cir. 1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978). The Government need not show an explicit agreement; the criminal scheme may be inferred from circumstantial evidence, which is as probative as direct evidence. *Id.*

In this case, there is ample evidence to support the finding of a conspiracy. The testimony of Mardones and Ossenberg shows the existence of a scheme to import cocaine from Chile to the United States and the actual importation of the cocaine by members of the conspiracy.

■ Once a conspiracy is shown, there need be only slight evidence to link the defendant with it. *Id.* The Government must show that an alleged co-conspirator had knowledge of the conspiracy and acted in furtherance of it. *United States v. Cloughessy*, 572 F.2d 190, 191 (9th Cir. 1977). Friedman, Garrity and Johnson each argue that the Government failed to prove his membership in the conspiracy. We examine each appellant's arguments separately.

### 1. Friedman

The only evidence of Friedman's participation in the conspiracy is that of Friedman's participation in the April, 1972 meeting. Friedman contends that the evidence shows only that he was a passive spectator at the meeting and not that he actively participated in the conspiracy. We disagree. It is true that mere association and activity with a conspirator does not constitute participation in the conspiracy. *Peterson*, 549 F.2d at 658. However, Friedman did more than innocently associate with members of the conspiracy. Friedman's presence at the meeting is proof that he knew that a conspiracy was being formed, and his active participation in the meeting strongly indicates his participation in the conspiracy. Mardones testified that both Vinje and Friedman were actively engaged in the conversation at the April meeting with respect to future drug dealings. Friedman also engaged in affirmative conduct in furtherance of the conspiracy by testing the cocaine and commenting on its high quality. We conclude that there is sufficient evidence to support a finding of Friedman's participation in the conspiracy.

### 2. Garrity

There is ample evidence from which the jury could reasonably find that Garrity actively participated in the conspiracy. According to Mardones's testimony, Garrity played an active role in the purchase of four kilograms of cocaine in August, 1972. His arrival in Chile was preceded by a telegram signed with his name and using the conspirators' code name "the hat". Garrity's registration at the Chilean hotel as "Mr. Snake" was consistent with co-conspirator McCoy's

announcement that the next visitor would be "the Snake". Finally, Garrity's conversation with Johnson in which he complained about O'Brien's profit-taking was evidence of Garrity's knowledge that he was acting in concert with a group of persons engaging in a series of transactions for the purpose of importing cocaine.

■ Garrity points out that neither Ossenberg nor Aguayo knew of him during the period in which the conspiracy was operating. However, a conspiracy may exist even though some of its members are not known to one another. *See United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir.), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977). That Garrity was not known to some of the other conspirators is not inconsistent with his membership in the conspiracy.

### 3. *Johnson*

As with Garrity, Johnson's conviction is supported by the evidence of his involvement in the cocaine sale in August, 1972. Johnson engaged in affirmative conduct in furtherance of the conspiracy when he brought from the United States the additional funds needed to consummate the cocaine sale. Again, the conversation between Garrity and Johnson concerning O'Brien's role in the scheme is evidence of Johnson's knowledge that he was acting in concert with others who were engaging in a series of transactions for the purpose of importing cocaine.

■ Johnson argues that the evidence of his conversation with Garrity is inadmissible hearsay. This contention is frivolous. Johnson's own statements were admissible under Fed.R.Evid. 801(d)(2)(A). Johnson's actions and statements provided substantial, independent evidence of his participation in the conspiracy; therefore, Garrity's statements were admissible as the statements of a co-conspirator made during the course of and in furtherance of the conspiracy. *See* Fed.R.Evid. 801(d)(2)(E); *Peterson*, 549 F.2d at 658.

■ We note that the support for the conspiracy convictions of Friedman, Garrity and Johnson is provided chiefly by the testimony of Mardones, a witness whose credibility was vigorously attacked. Nevertheless, it is exclusively the function of the jury to weigh the credibility of witnesses, *United States v. Young*, 573 F.2d 1137, 1139 (9th Cir. 1978), and the jury obviously credited Mardones's testimony. The court instructed the jury that the testimony of an accomplice should be viewed with caution; therefore, the jury could find Friedman guilty, based on Mardones's uncorroborated testimony. *See United States v. Jones*, 425 F.2d 1048, 1055 (9th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970). Moreover, Mardones's testimony was partially corroborated by the testimony of Aguayo and Price-Salcido and by the documentary evidence of Friedman's presence in Chile. The jury could reasonably conclude that Friedman, Garrity and Johnson were members of the conspiracy.

### B. *Variance*

McCoy does not challenge the sufficiency of the evidence linking him to a conspiracy to import cocaine; however, he argues that the evidence shows the existence of two separate conspiracies rather than a single continuing conspiracy, as charged in the indictment. Friedman, Garrity and Johnson join McCoy in his contention that this alleged variance between the indictment and the proof requires reversal of the conspiracy convictions.

■ A conviction for an offense other than that charged in the indictment must be reversed if the variance between the indictment and the proof affects the substantial rights of the parties. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Berger v. United States*, 295 U.S. 78, 81–82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The defendants were charged here with a single conspiracy commencing "on or about January, 1972 and continuing through on or about September, 1973". The jury was instructed that it must acquit all the defendants if it found

that "two or more separate conspiracies have been proven, rather than the single conspiracy as charged in the indictment". Implicit in the jury's verdicts of guilty is a finding of a single conspiracy.

■ The standard for determining the existence of a single conspiracy is whether there was a single overall agreement among the co-conspirators to perform various functions to carry out the objectives of the conspiracy. *Kearney,* 560 F.2d at 1362.

■ Viewed in the light most favorable to the Government, the evidence supports a reasonable finding that the conspirators were involved in a single, continuing business relationship, with O'Brien acting as financier and Torres-Romero as the supplier. *See Glasser,* 315 U.S. at 80, 62 S.Ct. 457.

The appellants place emphasis on Ossenberg's testimony that he viewed the transactions in December, 1972 and September, 1973 as isolated events. This testimony loses significance in light of Ossenberg's additional testimony that he discussed future deals with the Chileans on each occasion. Moreover, the performance by a conspirator of separate and independent acts in furtherance of the conspiracy is not inconsistent with the existence of a single overall agreement. *See Kearney,* 560 F.2d at 1362. The evidence suggests simply that Ossenberg was unaware of the scope of the continuing conspiracy, and not that each sale of cocaine was the product of a separate conspiracy.

The appellants also point to Mardones's testimony that Vinje had stated in December, 1972 that Vinje, McCoy, Garrity and Johnson had merged their efforts with those of O'Brien and Ossenberg. However, this evidence does not lead inevitably to the conclusion that two separate conspiracies merged at that late date. The jury could reasonably infer that O'Brien was the Seattle financier to whom Vinje referred at the initial meeting of April, 1972. The intended use of a water ski to conceal the cocaine lends credence to this inference. The August, 1972 conversation between Johnson and Garrity concerning O'Brien's role linked O'Brien to Vinje's group at that date. The

jury could reasonably find the existence of a single conspiracy, operating from approximately January, 1972 to September, 1973.

We find no variance between the conspiracy charged and the conspiracy proven.

### C. *Liability for Importation of Cocaine*

Johnson and Garrity challenge the sufficiency of the evidence supporting their convictions for importation of cocaine in December, 1972 and September, 1973. We affirm their convictions on these counts.

■ It was not necessary for the Government to show that either Garrity or Johnson directly participated in the two transactions in question. Each conspirator is liable for the acts of his co-conspirators in furtherance of the conspiracy, even if he is unaware of some of the acts or actors. *Pinkerton v. United States,* 328 U.S. 640, 645–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Oropeza,* 564 F.2d at 322.

■ The evidence supports a finding that Johnson and Garrity were members of the continuing conspiracy and that neither engaged in affirmative action constituting a withdrawal from the conspiracy. The evidence also shows that co-conspirator Ossenberg actively participated in the importation of cocaine in the December, 1972 and September, 1973 transactions. As members of the conspiracy, Garrity and Johnson are liable for these acts of importation.

### II.

### *Admission of Documentary Evidence of Presence in Chile*

■ McCoy challenges the admissibility of documentary evidence that showed his presence in Chile at relevant times. He contends that the hotel records admitted against him were not properly authenticated, that the travel documents were inadmissible hearsay, and that his passport was admitted against him in violation of his right against self-incrimination. However, in view of the other evidence introduced against McCoy, including the testimony of both Mardones and Ossenberg, we conclude

that any error in admitting the documentary evidence was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The testimonial evidence introduced against Friedman, Garrity and Johnson is less convincing, and it is likely that the jury seriously considered the documentary evidence to corroborate the testimony introduced against those appellants. Therefore, we will discuss the contention of Friedman that the district court erred in admitting the passport and the contentions of Garrity and Johnson that the district court erred in admitting the travel documents.

### A. *Passport*

█ Friedman argues that he was compelled to surrender his passport in violation of the Fifth Amendment, and therefore that the passport should have been suppressed.

In *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the Court defined the limits of the constitutional guarantee against self-incrimination:

[T]he Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a *testimonial* communication that is incriminating.

*Id.* at 408, 96 S.Ct. at 1579.

The incriminating information contained within Friedman's passport itself was not protected by the Fifth Amendment. The entries in the passport showing Friedman's presence in Chile are not testimonial declarations made by Friedman. *See id.* at 409–10, 96 S.Ct. 1569.

By producing the passport, Friedman may have made the tacit testimonial admissions that the passport existed, that it was in his possession, and that Friedman believed that the document that he surrendered was the passport requested. *See United States v. Osborn,* 561 F.2d 1334, 1339 (9th Cir. 1977). However, even assuming that those admissions were "compelled" by the condition to bail, those admissions are of minimal significance in this case and

do not rise to the level of "testimony" within the protection of the Fifth Amendment. *See id.; Fisher,* 425 U.S. at 411–13, 96 S.Ct. 1569.

The passport was properly admitted into evidence.

### B. *Travel Documents*

█ Garrity and Johnson challenge the admissibility of the Chilean "travel documents". The original Chilean immigration records would have been admissible under Fed.R.Evid. 803(8) as public records. However, the travel documents, a written summary of the official records offered to prove the content of the records, constituted hearsay. Fed.R.Evid. 801. The trial court ruled that the documents were admissible under the "catch-all" exception to the hearsay rule, Fed.R.Evid. 803(24). Rule 803(24) provides that the hearsay rule does not exclude:

[a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

The trial court's determination of admissibility of evidence under Rule 803(24) will not be overturned on appeal except for an abuse of discretion. *See United States v. Satterfield,* 572 F.2d 687, 690 (9th Cir. 1978) (admission under Rule 804(b)(3)).

The documents were offered as evidence of a material fact because they showed the appellants' entrance into and exit from Chile at relevant times, providing partial corroboration of the testimonial evidence. The statement was more probative on that point than any other that the Government could reasonably procure; the Government was unable to obtain any other evidence of entrance and exit on certain occasions.[1] The appellants were given sufficient advance notice of the Government's intention to introduce the statement, because the possibility of the admission of the document was discussed in the Government's trial brief.

 In examining the requirement of Rule 803(24) that the evidence have "equivalent circumstantial guarantees of trustworthiness", we compare the documents admitted into evidence in this case with the kinds of evidence admissible under the other hearsay exceptions listed in Rule 803. The exceptions to the hearsay rule in Rule 803 are made because the circumstances of the declaration indicate that the declarant's perception, memory, narration, or sincerity concerning the matter asserted in the statement is trustworthy. *Satterfield*, 572 F.2d at 691. The Chilean official who summarized the official immigration records surely encountered no problems of perception or memory in transferring the information from the records to the travel documents. There was no difficulty in the narration of the information; the information on the travel documents is simple and unambiguous; it pertains only to dates of entry and exit and involves no statements of a testimonial nature as to what Johnson or Garrity did in Chile. We are not persuaded that the Chilean official had any reason to falsify or misrepresent the documents. Consequently, we affirm the trial court's finding of equivalent trustworthiness.

The requirement of Rule 803(24)(C) that the court must find that "the general purposes of these rules and the interests of justice will best be served by the admission of the statement into evidence" is simply a further emphasis upon the showing of necessity and reliability and a caution that the hearsay rule should not be lightly disregarded and the admission should be reconciled with the philosophy expressed in Rule 102. 11 Moore's Federal Practice, § 803(24)[7] at VIII–210. Fed.R.Evid. 102 provides:

These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

We are satisfied with the reliability of the travel documents and with the showing of unavailability of alternative evidence on the same point. We are further satisfied that the policy of the rules has been observed.

We hold that the trial court did not abuse its discretion in determining that the travel documents were admissible under Rule 803(24).

### III.

*Disclosure of Information Held by the Government*

Johnson asserts that he was entitled to discovery of a diary that Mardones kept during 1972 and 1973 and of the notes of federal agents and prosecutors prepared during the investigatory interviews with Mardones. We conclude that neither the Federal Rules of Criminal Procedure, nor the Jencks Act, 18 U.S.C. § 3500, nor constitutional principles of due process required the disclosure of this material. We examine the statutory and the constitutional arguments separately.

### A. *Jencks Act and Rules of Criminal Procedure*

 Fed.R.Crim.P. 16 permits the discovery or inspection of certain kinds of evidence within the possession, custody or con-

---

1. There was extensive testimonial evidence of the appellants' presence and activities within Chile at various times; however, the travel documents provided the only evidence of the times of entrance into and exit from Chile on certain occasions.

trol of the Government. Similarly, 18 U.S.C. § 3500(b) enables a defendant to compel the production of certain statements or records in the possession of the Government. Neither Rule 16 nor § 3500 required production of Mardones's diary, because the Government did not have possession or control of it; the Chilean government seized the diary in 1974 and has retained possession of it.

■ For a different reason, the Government was not required to produce the notes of the interviews with Mardones. Rule 16 authorizes the discovery of a statement made by a Government witness only to the extent that 18 U.S.C. § 3500 compels its production. Fed.R.Crim.P. 16(a)(2). Section 3500 requires production of a "statement" if it is either (1) a written statement made by a Government witness and signed or otherwise adopted or approved by him, or (2) a substantially verbatim recital of an oral statement made by a Government witness and recorded contemporaneously with the making of the statement. 18 U.S.C. § 3500(e). Upon inspection of the notes *in camera,* the trial judge found that the notes were not signed nor otherwise adopted by Mardones, nor were they a "substantially verbatim" recital of oral statements made by Mardones. We have examined the notes, and we affirm the findings of the district court. The Government thus was not required to produce the notes.

### B. *Due Process*

■ To safeguard the defendant's right to due process of the law, the Government must disclose to the defense any material, exculpatory evidence of which the Government has knowledge. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs,* 427 U.S. 97, 106–107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). For purposes of this rule, evidence is "material" if it creates a reasonable doubt of the defendant's guilt that did not otherwise exist. *Agurs* at 112, 96 S.Ct. 2392.

■ The Government did not have access to Mardones's diary; therefore, it was unable to make the diary available to the defense. At most, the Government could have informed the defense of the existence of the diary; the contents of the diary are unknown. As stated by the Court in *Agurs*:

> The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.

427 U.S. at 109–10, 96 S.Ct. at 2400. The Government's failure to inform the defense of the existence of the diary did not deny Johnson a fair trial.

Neither did the Government have a constitutional duty to disclose the contents of the notes of the interview with Mardones. Upon inspection, the trial judge found no material exculpatory information in the notes. Our examination of the notes supports this finding.

### IV.

### *Grounds for Mistrial*

■ Johnson and McCoy both contend that the trial court erred in denying their motions for a mistrial. Both motions arose out of the testimony of Ossenberg, which implicated Johnson and McCoy in the conspiracy. Ossenberg admitted that on previous occasions he had stated that neither were involved in the drug dealings. Ossenberg gave two reasons for his previous misrepresentation of their involvement in the drug transactions: (1) O'Brien had told Ossenberg that McCoy had threatened harm to O'Brien and Ossenberg if McCoy were implicated, and (2) in a prior prosecution Ossenberg's attorney had advised Ossenberg, in the presence of Johnson's current counsel, not to implicate Johnson or McCoy. The appellants' major contention is that the prejudicial effect of this testimony so greatly outweighed its probative value that its presentation at trial created grounds for a mistrial.

The trial court is in the best position to determine whether an incident merits a mistrial. *United States v. Nace,* 561 F.2d

763, 768 (9th Cir. 1977). We have examined the record thoroughly and have considered the prejudicial effect of the testimony, the remedial effect of curative instructions given to the jury, and the opportunity available to the appellants themselves to minimize the prejudice engendered by the testimony. We conclude that Ossenberg's statements "did not so pervade the trial with prejudice so as to constitute an unfair trial." *Id.* at 769. The denial of the motions for a mistrial was not error.

## V.

### Remaining Contentions

■ McCoy raises two additional contentions. Neither is meritorious. McCoy argues that the trial judge received the verdict and polled the jury when neither McCoy nor his counsel was present, in violation of Fed.R.Crim.P. 43 and of the Sixth Amendment. However, it appears that McCoy voluntarily waived his right to be present, pursuant to Rule 43(b)(1), by disobeying the court's instructions to remain near enough to the courthouse to return within fifteen minutes of receipt of notice of the return of the jury. The court waited for forty minutes before taking the verdict. Moreover, McCoy has not shown that he suffered prejudice from his absence from this portion of the trial. Other defendants and their counsel were present to guard against irregularities. Any error was harmless beyond a reasonable doubt. *See Polizzi v. United States,* 550 F.2d 1133, 1137–38 (9th Cir. 1976); *Walker v. United States,* 116 U.S.App.D.C. 221, 322 F.2d 434, 436–37 (1963), *cert. denied,* 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964).

■ McCoy also contends that he was denied due process when the trial court limited his cross-examination of Aguayo. Aguayo's testimony was overshadowed by overwhelming direct evidence of McCoy's participation in the conspiracy. If the court erred, the error was harmless beyond a reasonable doubt.

*CONCLUSION*

The judgment of the district court is affirmed.