144 F.Supp.2d 892 (2001)
UNITED STATES of America, Plaintiff,
v.
Lawrence BOST, Defendant.
No. 1:99-CR-155.
United States District Court, W.D. Michigan, Southern Division.
April 26, 2001.
*893 Lawrence Bost, Kalamazoo, MI, pro se.
Cornelius Pitts, Cornelius Pitts Law Offices, Detroit, MI, William D. Hunter, William D. Hunter Law Offices, Detroit, MI, Richard Rosenberg, Royal Oak, MI, John F. Royal, Detroit, MI, for Lawrence Bost, defendant.

OPINION
ENSLEN, Chief Judge.
Defendant Lawrence has moved for a new trial pursuant to Federal Rule of Criminal Procedure 33 and for a judgment of acquittal pursuant to Rule 29. For the reasons which follow, the Court determines that the motions should be denied without an evidentiary hearing since the reasons for denial are clear from the trial record and the motion filings of the parties. See United States v. Nace, 561 F.2d 763, 772 (9th Cir.1977) (holding that decision of whether to have an evidentiary hearing on a motion for new trial is "within the sound discretion of the trial court"); see also Doganiere v. United States, 914 F.2d 165, 168 (9th Cir.1990); Baker v. United States, 781 F.2d 85, 92 (6th Cir. 1986); Sims v. United States, 1999 WL 1000855 (6th Cir.1999) (unpublished decision).

Factual Background
Defendant Lawrence Bost was indicted by the grand jury on September 29, 1999 for extortion in violation of the Hobbs Act (18 U.S.C. § 1951). The grand jury returned a Superseding Indictment against the Defendant on March 8, 2000, which charged the Hobbs Act violation (Count One) as well as solicitation and receipt of bribes by an official employed in a program receiving federal funds in violation of 18 U.S.C. § 666 (Count Two). Count One charged extortion as to the Defendant's conduct toward Digital Fusion corporation between March 1, 1999 and July 31, 1999. *894 Count Two charged solicitation and receipt of bribes by Defendant from representatives of Geysers International and Triad Consultants, Inc. between April 1999 and September 1999.
Trial of the charges was initially delayed because Defendant's first retained attorney, William Hunter, sought delay for the purpose of conducting discovery and because of his own ill health. A final pretrial conference was scheduled for May 30, 2000. However, the conference was not conducted on that date because attorney Hunter had neglected to inform the Defendant to be present for the conference. The conference was then conducted on June 5, 2000. On the following day, Defendant and attorney Hunter appeared before the Court to enter a guilty plea to the criminal charges pursuant to a plea agreement with the government. The guilty plea was entered and the matter was continued for sentencing.
After the plea, a pre-sentence investigation report was prepared by the assigned probation officer, which scored the offenses and recommended a period of incarceration. Also after the plea, Defendant retained attorney Richard Rosenberg. On June 26, 2000, the Court approved its Order substituting Rosenberg in place of Hunter as attorney for the Defendant. On July 13, 2000, Defendant, through attorney Rosenberg, filed his Motion to Withdraw Plea (Dkt. No. 37), which argued that the plea should be withdrawn because the Defendant was innocent of the offenses charged and had pled guilty only because of the inadequate trial preparation of attorney Hunter and because attorney Hunter advised him that the Court would not grant further adjournments for trial preparation. On November 30, 2000, the Court granted the Motion to Withdraw Plea and the trial was rescheduled for January 16, 2001.
On January 16, 2001, trial began. At trial, the government called twenty witnesses. The defense called nine witnesses, mostly character witnesses.
First to be called by the government was Joseph Chin. He testified that in 1999 he was employed by the State of Michigan's Department of Management and Budget and that he supervised the Defendant, a buyer for the Department. (Trial Transcript, Vol. II, at 207.) Chin testified that the Defendant was the buyer in charge of a rapid acquisition buying process for temporary technology workers known as RAPHITS. (Id. at 214.) According to Chin, the RAPHITS program operated by state agency officials making requests for technology workers which were posted on a bulletin board, which could then be accessed by pre-approved state vendors to make bids. (Id. at 217-222.) The vendors could then place bids by a specified date and the contracting agency would then rank the bidders. (Id. at 224.) Once ranked, the bids would be reviewed by the buyer to determine whether the bid price was reasonable in light of the other bids. (Id. at 226.) If a bid was high, then the buyer would discuss the matter with the contracting agency, although the contracting agency retained the right to select its vendor. (Id. at 226-227.) According to Chin, there were two steps to becoming a pre-qualified vendor on the RAPHITS program: first, file a copy of the company's 1099 tax form with the Department; and second, complete a pre-qualification package for the RAPHITS program with a letter agreeing to the requirements of the RAPHITS program. (Id. at 230-32.) The pre-qualification was simple and was designed to insure: (1) that the vendor agreed to the terms of the RAPHITS program; and (2) that the vendor had people available to bid on jobs on an hourly basis. (Id.) The *895 program allowed the buyer no discretion in rejecting vendor paperwork that met these standards. (Id.) (Id. at 233.) Once a vendor was approved, the vendor would receive a letter granting pre-certification and a password for the RAPHITS bulletin board. (Id. at 236.)
Chin further testified concerning a written letter by Defendant to Veda Chapman, a representative of a pre-qualified company, which stated that the company had been disqualified from RAPHITS and could not reapply for the period of one year. (Plaintiff's Exhibit 10.) Chin testified that there was no procedure for the program allowing this sort of disqualification and that there was no limitation on reapplication to the program. (Trial Transcript, Vol. II, at 241-243.) According to Chin, buyers in the Department were not permitted to perform outside employment without permission of the Department, to avoid conflicts of interest. (Id. at 247-49.) Furthermore, according to Chin, Defendant was aware of this rule in that he and Chin had conversations about the conflict of interest rules in connection with Defendant's outside work prior to the charged crimes. (Id. at 256-60.) Chin further testified that Defendant did not seek or receive permission to engage in employment as to any company making or attempting to make bids on the RAPHITS system. (Id. at 283.)
As to Count Two, Chin testified as a record-keeper to his Department's business records, which included contract and purchase approvals made by the Defendant as to Geysers, International, Triad Consultants and Labor Force 2000. (Id. at 260-282; Plaintiff's Exhibits 10-16.) He also testified that, with the exception of late bids, all bids received in the RAPHITS system were to be considered in the bid review process and were not to be disqualified by a buyer. (Id. at 244.) At the conclusion of his direct testimony, the parties stipulated that the Department and the agencies which entered into the relevant contracts (Plaintiff's Exhibits 10-16) all received in excess of $10,000 of federal funds during 1999. (Id. at 283.)
For its second witness, the United States called Veda Chapman, an authorized representative of Digital Fusion corporation. (Trial Transcript, Vol. III, at 391.) She testified that Digital Fusion was an approved vendor with a password for the RAPHITS system. (Id. at 398-99.) During conversations with Chapman, Defendant expressed concerns about contract paperwork prepared by representatives of Digital Fusion. (Id. at 400.) Defendant told Chapman and Troy Walker (Chapman's supervisor) that he did consulting work and could come to Florida (the corporation's headquarters) to provide a seminar on bid preparation. (Id. at 402-403.) The Defendant later told Chapman that his rate for consultation was $250 per hour to be paid in cash. (Id. at 405.) He also told her that the total fee for the consultation would be $5,000 and that he wished to schedule his own flights and hotel reservations. (Id. at 416.) The Defendant also later complained to Chapman when he received a W-9 tax form and a travel invoice from Digital Fusion at his work address. He told Chapman that this contradicted his instructions to avoid paperwork and that he did not want to "mess with taxes." (Id. at 419-420.) After receipt of the W-9, Defendant told Chapman that he did not have time to deal with her and that everything was in a "hold pattern." (Id.) A week later Chapman received the letter from Bost, Exhibit 10, which disqualified the company from RAPHITS for one year. (Id. at 422-23.)
After these conversations, Chapman's company made contact with the Federal Bureau of Investigation concerning the *896 Defendant. Later telephone calls with the Defendant were then tape recorded by F.B.I. Agent Mark Benston. (Id. at 423-24.) Chapman testified that the tape recordings accurately reflected telephone conversations she had with the Defendant on July 20, 1999 and thereafter. (Id. at 426, 430-31; Trial Transcript, Vol. III, at 444-446; Exhibit 17, Exhibits 19-24.) During these taped conversations, Defendant agreed with Chapman that he had put up a "brick wall" for her because he had not been paid. (Exhibit 19.) He also inquired of Chapman, when asked about placing Digital Fusion on RAPHITS, "What is in this shit for me?" (Exhibit 20.)
During the telephone calls, Chapman arranged to pay Defendant $5,000 in cash. Chapman met the Defendant in the parking lot of the Excaliber Restaurant on the evening of July 29, 2000 as arranged. (Trial Transcript, Vol. III, at 448.) Chapman was then wearing a concealed microphone device, which recorded the conversation in part. (Id.) A videotape was also made of the entire meeting. (Id. at 449-51; Exhibits 25A and 25B.) The videotape and audio tape disclose a drop-off of a white envelope containing $5,000 cash to Defendant in the open parking lot, with the Defendant dropping the envelope into the front seat, passenger side of his car, and then inquiring of Chapman whether she was "wearing a wire." (Exhibits 25A and 25B.) He also discussed getting future contracts for Chapman for a "percentage." (Trial Transcript, Vol. III, at 453-54.) Within days of being paid by Chapman, the Defendant reinstated Digital Fusion to RAPHITS. (Exhibit 27.)
Chapman's testimony about the extortion was also buttressed by the testimony of both Roy Crippen and Nicole Jordan. Crippen, the President of Digital Fusion, testified that he had called Bost to request that Bost submit a W-9 tax form and that Bost failed to comply with his request and failed to submit any invoicing to document a bill for services. (Trial Transcript, Vol. IV, at 524-29.) Crippen further testified on cross-examination that Bost was not owed $5,000 for consulting. (Id. at 552-53.) Nicole Jordan, a representative for Digital Fusion, testified that Lawrence Bost left voice messages with her for Roy Crippen instructing Crippen to get a hold of Bost or it would jeopardize Digital Fusion ever doing business with the State of Michigan and that if he, Bost, did not get his money he would pull the business. (Trial Transcript, Vol. IV, at 516-517.) Jordan described the tone of these telephone messages as angry. (Id.)
As to Count Two, the United States presented a number of witnesses including especially John Haymon, the owner of Triad Consultants and a past vice-president of Geysers, International. Haymon testified that he became a vice-president of Geysers, International in early 1999 and in that capacity sought contracts with the State of Michigan for computer programming work. (Trial Transcript, Vol. V, at 586-87.) In this capacity, Haymon contacted Defendant and sought contracts through the State of Michigan. (Id. at 589.) After a month of such contracts, Defendant requested a "consulting fee" from Haymon to "advocate" for the company. (Id.) Defendant further requested that he be paid "up front to guarantee the contract" "in cash" and that there be "no written documentation" of the payment. (Id. at 591-92.) Haymon, after consulting with the company president, Mani Nallapillai, and the Defendant paid Defendant $5,000 by cashier's check payable to Rhonda Bost for the awarding of the $95,700 contract sought. (Id. at 597; Exhibits 35 and 11.) Haymon also testified that Bost continued to solicit bribes and receive bribes in connection with other contracts *897 sought by his company, Triad Consultants, including: (a) a $24,300 purchase order secured by a cash payment of $1,500; (b) a $504,000 contract secured by payment of $12,000-$14,000; (c) a $239,200 contract secured by payment of approximately $4,000; and (d) a $351,520 contract secured by a payment of approximately $4,000 (which contract was later voided). (Trial Transcript, Vol. V, at 599-614; Exhibits 12-15, 36.1, 36.2, 39-42.)
Haymon also testified that around Thanksgiving 1999 Bost called Haymon and told him that he had been visited by the F.B.I. and that he, Haymon, should destroy all e-mails and documentation of their transactions. (Id. at 617.) Haymon explained that Bost had told him that he could obtain the contracts at issue by not relying upon the bid information that he posted on the RAPHITS system (which would be inaccurate) and instead relying upon the bid information he privately sent to Haymon (which would be accurate). (Id. at 618-25; Exhibits 43-46.) While Haymon admitted that in his conversations with Bost that the fees paid were described as "consulting fees," his testimony indicated that no services were performed for these "consulting fees" other than the delivery of the secret bid information and the Defendant's "advocacy" during the bid selection process. Haymon also recounted that Bost bragged during telephone conversations, in answer to the question of how he guaranteed contracts, that "I can push papers or bids off the desk and they can find their way into the trash can." (Id. at 607-08.)
Haymon's testimony was corroborated in numerous ways: it was consistent with the private mailings to Haymon and checks to Rhonda Bost; it was consistent with the state's documents, which showed significant differences between the skills sought by the contracting agencies and the skills advertised on RAPHITS; and it was consistent with the testimony of a large number of other government witnesses, most of whom had no motive to testify untruthfully. In particular, it was corroborated by the testimony of Bijay Satapathy that in 1999 John Haymon requested a $3,000 personal loan from Haymon and requested that the loan amount be paid to Lawrence Bost. (Trial Transcript, Vol. V, at 680-92; Exhibit 38.) Satapathy recounted that, after receiving instructions from Lawrence Bost, he delivered a $3,000 personal check to Bost in the parking lot of the Southfield Holiday Inn. (Id.) Haymon's testimony was further corroborated by testimony from both representatives of the government contracting agencies and of competing companies that had lost bids  Diane Kramer, Margaret Ann Dontje, Brian Smith, Harish Tekhandani, and Elaine Johnston. Kramer, Dontje and Smith testified that the requested qualifications as to the contracts awarded to Triad Consultants and Geysers, International were not accurately posted on RAPHITS. (Trial Transcript, Vol. V, at 693-712, 727-744, 748-758.) Tekhandani and Johnston testified that Bost had disqualified competing bids for arbitrary reasons  which reasons did not constitute valid reasons for disqualification of the bids as to the RAPHITS program. (Trial Transcript, Vol. VI, at 864-871, 875-892.) Kramer, Dontje and Chapa also testified that when they (as officials of the contracting agency) selected a company other than Triad Consultants or Geysers, International in connection with these RAPHITS bids that the Defendant pressured them not to select their desired candidate  by saying things like, you should not select that candidate because when another agency did a similar thing it was subjected to an appeal. (Trial Transcript, Vol. V, at 693-712, 727-744, 759-775; Trial Transcript, Vol. VI, at 793-798.)
*898 For Defendant's case, attorney Rosenberg first called Ronald Crump, a salesman and marketing representative for V-E-D Software Services. (Trial Transcript, Vol. VII, 981-990.) Crump's testimony challenged the testimony of some government witnesses about the possibility that the Defendant had in fact altered some of the resumes submitted by competing bidders. (Id.) It did not, however, give the jury cause to question the most damaging claims made by the government witnesses.
Defendant's second witness was Jeffrey White, a buyer in the Department of Management and Budget who did not work on the RAPHITS program. (Id. at 996-1007.) White's testimony was very limited because he testified that he did not have knowledge of the RAPHITS program. He did, however, testify as a character witness that the Defendant had a reputation as an honest person. (Id.) It was elicited on cross-examination that the witness did not know much about the allegations in this case and could not say whether it would affect his opinion. (Id. at 1007-08.)
Defendant's third witness was Darleen Sue Heim, another buyer in the Department. She testified that Defendant had a reputation for truthfulness. (Id. at 1011.) She was cross-examined on the basis that she did not consider the allegations of this suit in rendering her opinion. (Id.) Defendant's fourth witness, Robin Boyer, the Defendant's sister, gave similar reputation testimony. (Id. at 1013-1021.) Defendant's fifth witness, Carlos Glenn, the Defendant's first cousin, also gave supportive reputation testimony. (Id. at 1022-1027.) Defendant's sixth witness, Kenneth Richman, Defendant's brother-in-law, also testified that the Defendant had a reputation for truthfulness. (Id. at 1030.) Denise Peterson, seventh witness, a social friend of Defendant and his wife, testified that people in her social circles spoke highly of Defendant (though she did not specifically indicate an opinion as to truthfulness). (Id. at 1035.) Defendant's eighth witness was his wife, Rhonda Bost. She testified that the Defendant had a reputation for truthfulness. (Id. at 1041.) However, she admitted on cross-examination that the Defendant had initially concealed an affair from her and that she received checks from Defendant's employers to conceal conflict-of-interest violations for him. (Id. at 1041-48.)
Defendant's ninth and final witness was the Defendant himself. Defendant testified that he began as a buyer with the Department shortly before Joseph Chin became his supervisor. (Id. at 1062-63.) He stated that as a buyer he was called upon to "continuously" exercise discretion in the bidding process. (Id.) According to Defendant, he was trained to disallow certain kinds of bad bids  including late bids, bids containing resumes with consultant trademarks or logos, bids where pricing and technical information were not separated, and bids where the vendor failed to properly certify that the vendor had consultants available to perform the work. (Id. at 1064-1067, 1107.) Defendant testified that this discretion was part of the standard conditions and terms for state purchasing. (Id.) He also said that vendors lacked the ability to change bid specifications after bids were solicited. (Id. at 1065.) According to Defendant, vendors could be disqualified from RAPHITS if they were inactive for a 12-month period. (Id. at 1068.) They also could be disqualified, according to Defendant, for the submission of a "no bid" (a form indicating that no bid was placed) as to a project. (Id. at 1072.) Defendant further claimed in his testimony that Joseph Chin, his supervisor, had only given him a brief explanation of the RAPHITS purchasing program and that the procedures for RAPHITS were being "fine-tuned" throughout the *899 program. (Id. at 1074-75.) Defendant explained how he interpreted language in bid forms as granting him discretion to reject bids in the RAPHITS bidding process. (Id. at 1076-84.) Furthermore, he explained the process he normally used with vendors and agencies for opening bids and disqualifying vendors and how he was required to exercise discretion to avoid criticism by vendors. (Id. at 1085-1100.)
After Defendant's lengthy morning testimony, he resumed testimony about his use of the bid process as to the relevant bids. He testified that did nothing improper in the bidding process to secure an award of the $504,000 contract to Triad Consultants and that the selection was made by Ann Dontje or Diane Kramer and not by himself. (Id. at 1106.) His attorney offered the pricing information as to the other bids to show that the Triad Consultants' bid was less than one-half of some other bids. (Id at 1105-06.)
On the subject of Digital Fusion, the Defendant testified that he had worked as a consultant for Digital Fusion and had earned the $5,000 for consultant work for Digital Fusion. (Id. at 1109). He explained that Veda Chapman was unfamiliar with the bidding process and needed consulting to familiarize herself with the process, including the handling of bids and technology consultants. (Id. at 1109-11.) Defendant said that he did work in preparing a "template" for Veda Chapman  showing her the necessary "skill sets" for certain positions. (Id. at 1113.) Defendant estimated his total work at between 10 and 15 hours. (Id. at 1113.) He admitted, though, that he had not keep accurate track of his hours  which he had said earlier in his testimony may have been as much as 60 hours over a two-week period. (Id. at 1114.) He also admitted that he had never gone to Florida to give a seminar, but believed that he was entitled to more than the $5,000 he requested. (Id. at 1116.) Further, he explained that Digital Fusion was disqualified solely because its predecessor (Power Cerv) had not placed bids. (Id. at 1125.)
Defendant's testimony then turned to his relationship with John Haymon. Defendant testified that he had received $25,000-$30,000 in payments from John Haymon. (Id. at 1126.) He testified that these payments were made to him for consulting, for setting up three or four computer systems in Haymon's home to be used as an in-home networking system, and for work in preparing resumes for Haymon. (Id. at 1127.) According to Defendant, in connection with this work, he traveled to Florida to deliver resumes to Haymon. (Id.) He estimated his total work for Haymon at between 75 and 150 hours. (Id. at 1129.) Defendant explained that his request by e-mail to the hiring agency for a "favor" for Triad Consultant was only a request for impartial consideration. He explained that he did this because he believed that the state agency involved in the bid process was improperly considering Triad Consultant's bad performance on one contract as a reason for not selecting the company for a later contract. (Id. at 1132-33.) He denied, however, using his office to assist Triad Consultants in obtaining bids. (Id. at 1134.) Defendant admitted that prior to engaging in any of his employment he should have requested permission from his employer; but stated that he did not do so because he knew that the request would not be approved due to conflict-of-interest rules. (Id. at 1137-38.)
On cross-examination and the Court's examination of the Defendant, the Defendant made a number of admissions. He admitted that his testimony directly contradicted Joseph Chin's testimony about the scope of his authority and the instructions he was given as to the bid process. *900 (Id. at 1141). He admitted that his Department gave free seminars about the bid process which were available to the public. (Id at 1142.) He admitted writing the letter (Exhibit 10) which disqualified Digital Fusion/PowerCerv from the RAPHITS system. (Id. at 1146.) He conceded that he had originally explained the $5,000 payment to Agent Benston as a payment on a personal loan and changed his account the following day. (Id. at 1153-54.) He admitted that within days of Veda Chapman's payment he issued the letters (Exhibits 28 and 29) placing Digital Fusion on RAPHITS. (Id. at 1155.) He conceded that he knew prior to the letters (at least by the date of an earlier e-mail, Exhibit 18) that Digital Fusion was PowerCerv's successor. (Id. at 1157-58.) He admitted that he was the official responsible for preparing the contract specifications posted on RAPHITS (with the help of secretarial staff). (Id. at 1162-63.) He admitted that there were differences between the RAPHITS specifications and the specifications given him by the agencies. (Id. at 1164-65.) He conceded telling John Haymon to rely upon the specifications submitted to him privately. (Id. at 1165.) He agreed that Geysers, International and/or Triad Consultants received RAPHITS contracts, Exhibits 11-14, and that in these matters he had excluded some bids and made recommendations favorable to the companies. (Id. at 1165-68.) He admitted that a contract, as to which he was the buyer and as to which bids were excluded, Exhibit 15, was initially awarded to Triad Consultants. (Id. at 1168-70.) He further conceded that the white envelope handed him by Veda Chapman contained $5,000 in one hundred dollar bills. (Id. at 1192.) He admitted throwing it onto his car seat as soon as he received it. (Id.) Furthermore, he admitted asking Chapman whether she was wired and asking whether he could look down her blouse to see if she was wired. (Id. at 1194.) The Defendant denied, however, as to a $134,500 contract, that a cash payment he received from Haymon, of $6,725, was based on five percent of the contract price. (Id. at 1196.) He explained the percentage as a coincidence  since his flat fee of $6,500 plus $225 travel expenses equaled five percent. (Id.)[1]
Upon conclusions of the proofs, the jury was instructed and the parties presented closing arguments. The jury was discharged for deliberations at 11:25 a.m., ate lunch, and returned with guilty verdicts on both counts at 2:50 p.m.
Upon conviction, the Court immediately conducted a show cause hearing which asked Defendant and his counsel to show cause why the Court should request investigation of the United States Attorney of Defendant and his counsel for perjury and subordination of perjury in connection with Defendant's denials of extortion and receipt of bribes in the instant case. At the conclusion of the hearing, the Court did request, by letter, that the United States Attorney investigate the matter. Because this situation created a potential conflict of interest, attorney Rosenberg moved to withdraw as counsel. This motion was granted and Defendant's new counsel was retained and appeared shortly thereafter.
Within seven business days of the conviction, Defendant's new counsel sought and received an extension to file motions for judgment of acquittal and motions for new trial. Within the extended period, Defendant's counsel moved for new trial *901 and for a judgment of acquittal. The motions have now been fully briefed.

Rule 33  Standards for Motions for New Trial
Defendant has moved for new trial under Federal Rule of Criminal Procedure 33. Rule 33 permits the Court to grant a new trial to a defendant in a criminal case if it is "in the interest of justice." United States v. Davis, 15 F.3d 526, 531 (6th Cir.1994) (quoting Rule 33). Whether to grant a Rule 33 motion is a matter for the district court's discretion. Davis, 15 F.3d at 531. The Defendant bears the burden of proving a new trial should be granted. Id. (citing United States v. Seago, 930 F.2d 482, 488 (6th Cir.1991)). The permissible reasons for granting new trial (when brought within seven business days of the jury verdict) are not limited by the Rule and include ineffective assistance of counsel. See, e.g., United States v. Koehler, 24 F.3d 867 (6th Cir.1994). The standard for judging ineffective assistance of counsel in the context of a Rule 33 motion are those specified by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): namely, whether counsel's performance fell below the objective standard for professional conduct and whether the performance prejudiced the outcome of the proceedings.
In gauging counsel's performance, the Supreme Court emphasized that,
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."
Id. at 689, 104 S.Ct. 2052 (citations omitted).
In determining prejudice, the courts are to determine whether, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052.

Rule 29  Standards for Motion for Judgment of Acquittal
Rule 29 provides in pertinent part that the district court either on its own motion or on the motion of a party shall enter a judgment of acquittal if the evidence presented is insufficient to sustain a conviction on the charges. Rule 29(c) also allows a defendant to raise this issue post-trial (within seven days or within an extended period set by the district court within the seven day period). These provisions are intended to guarantee the constitutional protection of the Due Process Clause that in every criminal case the government must prove every element of the crimes charges beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
*902 In evaluating the proofs as to a Rule 29 motion, the motion must be denied "if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." United States v. Canan, 48 F.3d 954, 962 (6th Cir.1995); United States v. Nash, 175 F.3d 429, 432 (6th Cir.1999). United States v. Nabors, 901 F.2d 1351, 1357 (6th Cir.1990). In making this evaluation, the sufficiency of the evidence must be viewed in terms of the entirety of the record. United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984). In this regard, the standard is the same whether the supporting evidence was direct or wholly circumstantial. Id.

Rule 33  Motion for New Trial
Defendant in his Motion for New Trial, Supplemental Memorandum, and supporting Affidavit claims that counsel made numerous errors prejudicing his defense. Defendant lists a catalogue of reasons and attaches a sheaf of documents that he claims should have been introduced at trial. Defendant also claims that the Court erred in allowing evidence of plea agreements. The issue of ineffective assistance of counsel will be addressed first.

Ineffective Assistance of Counsel
Defendant's first charge at the feet of attorney Rosenberg was that he was ineffective in being one hour late for the first day of trial. Defendant makes the argument that, although the jury never was told that the defense attorney was late, they could infer this from the circumstances and were likely to draw a negative inference against the Defendant.
At the end of the first trial day, outside the presence of the jury, the Court had attorney Rosenberg show cause for his late appearance. He explained his late appearance as caused by the failure of his hotel clerk to give him a requested wake-up call. (Trial Transcript, Vol. I, at 162.) This explanation was consistent with the fact that attorney Rosenberg, by his secretary, had called the Court's secretary at around 9:00 a.m. to inform the Court that he had overslept and was en route. The Court then warned attorney Rosenberg about late appearance and he appeared timely for the remainder of the trial.
While timely appearance is part of the expected stock-in-trade of a criminal defense attorney, the criminal defense attorney, like the rest of human kind, is subject to the usual perils and mistakes that besiege the human condition. It appears that the late appearance was a one-time mistake caused by extraneous circumstances. Thus, it would be improper to conclude that attorney Rosenberg, in this instance, violated the standards for professional conduct. Furthermore, there is no reason to believe that the jury even knew of attorney Rosenberg's late appearance, much less drew a negative inference. The late commencement of trial could have been caused by the late arrival of any other necessary persons (such as security personnel) and there was little reason for the jury to jump to the conclusion that attorney Rosenberg was late. Furthermore, this event caused no prejudice. During the delay, the Court discussed extraneous matters with the jury, including the general videotape viewed by jurors, which reminds them, in the words of the Court, "to have no animosity toward anybody and [to be] fair and impartial juror[s]...." (Id. at 13.) This reminder, as well as the Court's many instructions to the jury, to decide the case only based on the evidence, was more than sufficient to dispel any prejudice that might have arisen had a juror inferred that attorney Rosenberg was late.
Defendant's second charge against attorney Rosenberg is that he asked some repetitive *903 and unhelpful questions of witnesses (which was noted by the Court to attorney Rosenberg, mostly in off-the-record comments). While it is true that attorney Rosenberg did ask some repetitive and unhelpful questions, this is not to say that attorney Rosenberg did not, particularly after it was called to his attention, ask other questions which were relevant to the issues and helpful to the jury. In the Court's experience, it is not unusual for many attorneys to be imprecise and unhelpful at times in their examinations. Attorney Rosenberg's conduct in this regard, while far from exemplary, was not so outside the norm of attorney practice as to warrant the conclusion that he rendered ineffective assistance of counsel. Furthermore, the Court believes that the jury drew no adverse inferences against Defendant given that the jury received the standard instruction (6th Circuit Pattern Criminal Jury Instruction 1.04) to decide the case only on the evidence and not based on the attorney's questions or rulings on objections.
Defendant's third charge is that defense counsel, even after receiving warnings from the Court, presented evidence which was damaging to the client because it opened the door to damaging cross-examination. In particular, Defendant makes this point as to the testimony of character witness Rhonda Bost  which testimony was cross-examined on the basis that the Defendant, not being honest, had concealed from his wife an affair she later discovered.[2] While the Court shares Defendant's conclusion that, as it happened, the testimony was not helpful to the defense, this is not to say the decision to use this testimony was so outside the wide range of legitimate trial strategies as to constitute ineffective assistance. Defense counsel was apparently hoping that Rhonda Bost, a sympathetic spouse, would provide the jury with an emotional, though not a factual, reason for acquitting the defendant. This was a legitimate trial strategy, notwithstanding its abject failure.
Defendant also argues that defense counsel should not have called Rhonda Bost because, in response to government questions of her, she asserted her Fifth Amendment right against incrimination and testified that she did not endorse certain government exhibits, which were checks payable to her. As to this point, the Court simply notes that, even were such testimony anticipated, it was not outside the range of professional conduct to call the witness given the hope of evoking emotional sympathy with the jury. Furthermore, the notion that defense counsel should have anticipated this series of events is not entirely fair. The questions asked were raised by the government, not by the defendant, and were outside the of the scope of the direct examination. The witness' decision to assert her privilege was made with a great degree of hesitancy and consternation by the witness  which tends to show that defense counsel could not have predicted her behavior on the stand regardless of the extent of his prior inquiries.
Defendant also charges that counsel was ineffective in the presentation of testimony and exhibits. The most important of these issues is the testimony of the Defendant himself, which the Court will address last in this part of the legal analysis.
Defendant argues that counsel was ineffective in failing to present testimony that *904 Robert Sharpley, a prosecution witness, had made a prior inconsistent statement to Ronald Crump, a defense witness, to the effect that Sharpley had not paid a five-percent bribe to the Defendant. This testimony was not presented because defense counsel failed to first give the prosecution witness an opportunity to deny making the statement as required by Federal Rule of Evidence 613(b). In this regard, the Defendant is correct that his counsel did not perform up to the standards of the Federal Rules of Evidence and, probably, also Strickland. However, the Court can discern no significant prejudice. This issue was a side-issue, relating to Rule 404(b) evidence, and the Defendant was just as likely benefitted by the failure to give the 404(b) evidence additional attention. Defendant's story regarding this Rule 404(b) evidence  that he just happened to perform services for Sharpley near the time of the contract, that the fee for his services (which had not been precisely billed) just happened to equal five percent of the contract price when a $225 travel expense charge (which was never documented) was added to the total and that Sharpley just happened to be awarded the contract (when he had previously been uniformly rejected as a bidder on many previous contracts)  was a transparent fraud. The fact that less attention was devoted to this issue, in the Court's view, could only assist the Defendant.
Defendant argues that defense counsel was ineffective in failing to object to the admission of Exhibit 38.1/Defendant's Attachment 13  which was a copy of the Defendant's bank statements (which reflected receipt of bribery and extortion payments). Defendant argues that the bank statements contained handwriting (check marks and initials) which were made by law enforcement officers who studied the statements, that the notations were inadmissible and that the jury certainly considered them in that the jury sent out a note inquiring about the notations. This argument is fanciful and involves a minuscule issue. The notations themselves suggest little or nothing particularly where there was no evidence in the record of who made the notations. When the jury made its question, the Court instructed the jury that "there is no evidence to explain the initials." (Trial Transcript, Vol. VIII, at 1305.) Thus, defense counsel was not in error in failing to object (the issue being insignificant) and that the evidence of the notations did not prejudice the Defendant in that the jury was told, more or less, to ignore the issue.
Defendant argues that defense counsel was deficient in failing to object to the Court's instructions regarding witnesses testifying under grants of immunity. For the reasons given later in this Opinion, the Court determines that there was no proper basis for an objection and no prejudice resulting from the failure to make this unwarranted objection.
Defendant argues that counsel was ineffective for failing to present into evidence several documents, including: the competing bids on the contracts alleged to have been awarded because of bribery (Defendant's Attachments 14-45); e-mails from Elaine Johnson and Carolyn Lauer (Attachments 1 and 2/Exhibits B and D) which expressed their decisions (as the contracting officials) to select Triad Consultants; various State of Michigan purchasing policies and procedures and bid forms, including procedures for awarding bids and appealing bid awards (Attachments 3, 6, 7 and 8/Exhibits E, J, K and L); a document showing that a state agency, the Michigan Information Center, had made a request that Triad Consultants be given a particular contract, Exhibit 14 (Attachment 4/Exhibit H); a document showing the requirements for pre-certification *905 in RAPHITS (Attachment 8a/Exhibit M); and a set of documents which were mailed by Defendant's office which gave unsuccessful bidders notice of a right to appeal (Attachment 5/Exhibit I).
Defendant additionally makes the related argument that defense counsel was ineffective in failing to subpoena the following records and/or testimony: telephone records that showed that he had a close and on-going relationship with John Haymon; the hotel records of a hotel showing that Defendant and Veda Chapman had booked separate rooms for overnight on the evening May 6, 1999 (Attachment 9); Digital Fusion's Application of August 2, 1999, which pre-dated the grant of pre-certification on August 5, 1999 (Attachment 10); a policy statement that late bids may be disqualified (Attachment 11); and a letter of praise from John Haymon (Attachment 12).[3]
A review of the documents mentioned reveals much chaff and little wheat. First, the competing bids themselves would have been relevant and admissible, but very insignificant in the scheme of the overall proofs. The government's main theory was that the Defendant manipulated the bidding process by the RAPHITS description published and by advocacy. The exact competing bids would have aided very little in understanding this testimony. Furthermore, the reasons why the Defendant thought he could properly disqualify a number of the bids  contrary to the testimony of his supervisor  were adequately explained on the record testimony without reference to the bid files. Second, the fact that the agency officials ultimately selecting the winning bidders (as expressed in their e-mails) was admitted in oral testimony and was, in fact, part of the government's main theory  that the Defendant had manipulated the process so that the agency officials would make the selections by actions such as eliminating bids and advocating vendors.[4] Third, the particular general purchasing policies referenced were mostly immaterial. Those policies were general policies and did not specifically address the RAPHITS program. The fact that bid awards were subject to appeal and that this was communicated to losing bidders was openly discussed in the proofs and was conceded by the government. These exhibits were simply not telling in the context of the overall evidence and the failure to offer them did not cause prejudice.[5] Fourth, introduction of the written request by the Michigan Information Center that Exhibit 14 be placed with Triad Consultants was unnecessary since this fact was made clear in the oral testimony. (Trial Transcript, Vol. V, at 561-571.) Fifth, the document describing the pre-certification requirements for the RAPHITS program (Exhibit M) was unnecessary *906 in that the program pre-certification requirements and disagreements about those requirements were adequately developed in the oral testimony, especially the testimony of Joseph Chin and the Defendant.
As for the set of items which Defendant claimed should have been subpoenaed and presented at trial, an analysis of the documents shows them to be dross and not gold. Telephone records of John Haymon show only that the Defendant often received calls from Haymon, which was admitted in Haymon's testimony. They do not show, nor do they have any tendency to show, whether the subject of those calls was legal or illegal business. The hotel receipt evidence at issue is very insignificant because it demonstrates only that Chapman and Defendant rented rooms on the same night; it does not say anything about the purpose of their stays. The mere fact of their stays was admitted by Veda Chapman. (Trial Transcript, Vol. IV, at 486.) The August 2, 1999 application of Digital Fusion was relevant and admissible on the issue of the extortion crime. Nevertheless, the application itself is very weak evidence in that it does not explain or comment on the earlier payment to Lawrence Bost  which apparently "greased the skids" for the processing of the application. The policy statement that late bids could be excluded was very insignificant in this case since the government by the testimony of Joseph Chin conceded that this was a proper basis for rejections of bids. (Trial Transcript, Vol. II, at 244.) Likewise, the letter of Haymon praising Bost (Attachment 12) is insignificant. It coincided in time with the contracts awarded to Haymon and is equally consistent with gratitude borne out of bribery.
Last, but not least, is the issue of whether defense counsel performed ineffectively in calling Lawrence Bost to testify. Unlike many of the items listed above, this decision has all of the hallmarks of unprofessional conduct. First of all, the calling of Lawrence Bost to testify followed a plea hearing in which the Defendant made very specific admissions about his criminal conduct. These specific admissions were sufficient to instruct any competent defense attorney that the Defendant was in fact guilty of the offenses and that his statements denying extortion and bribery were perjury. Second, even without the prior plea hearing, it was evident beyond any remote question from the government's case, especially including the video and audio tape and the testimony of uninterested government witnesses, that the Defendant had committed both of the charged offenses. Thus, any reasonably competent defense attorney should have known to not call Defendant Lawrence Bost to suborn the perjury elicited at trial.
This conclusion is buttressed by the Supreme Court's decision in Nix v. Whiteside, 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), which affirmed the right of defense counsel not to call a defendant for the purpose of giving perjured testimony and suggested that violations of ethical rules are usually, but not always, below the standard for competent representation. As the Nix Court said:

Strickland mandates that "[p]revailing norms of practice as reflected in American Bar Association Standards and the like, ... are guides to determining what is reasonable, but they are only guides." Id. at 688, 104 S.Ct., at 2065.
Under the Strickland standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel. When examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so *907 restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts.
Nix, 475 U.S. at 165-66, 106 S.Ct. 988 (quoting Strickland). The Nix Court then went on to hold that the client had not received ineffective assistance counsel when the attorney sought to withdraw rather than suborn perjury because it was elementary that a criminal defendant did not have a constitutional right to present false testimony.
While the decision in Nix underscores the duty of counsel to prevent perjury, it also underscores that relief is not available on the ground of ineffective assistance in the absence of prejudice. In this case, an analysis of the proofs presented and the likelihood of acquittal in the absence of the Defendant's testimony shows that there was no reasonable likelihood that the unprofessional conduct altered the outcome of trial. To put the matter bluntly, the outcome of the jury's verdict, regardless of whether the Defendant testified, was a foregone conclusion given the documentary evidence, videotape, audio tape, and multiple consistent government witnesses including public employees whose testimony was beyond reproach.
For the same reasons, the Court determines that the totality of the errors by counsel did not prejudice the Defendant. This defense was the Titanic's voyage. Rearranging the deck chairs would be but an ode to futility.

Plea Agreements
Defendant's second argument for new trial relates to the plea agreements of cooperating witnesses John Haymon and Robert Sharpley. Defendant suggests that this case was like the case of United States v. Carroll, 26 F.3d 1380, 1388 (6th Cir.1994)  a case in which a conviction was reversed because the government suggested that language in a plea agreement requiring truthful testimony lent credence to the witness' testimony.
In this case, the government made no such arguments. The jury was given the standard Sixth Circuit criminal jury instruction on a witness testifying under a promise that the witness will not be prosecuted. See Sixth Circuit Standard Criminal Jury Instruction 7.07. Testimony about the plea agreements was material to the credibility of the witnesses. The Court, in addressing the pleas agreements (which required truthfulness testimony) during the trial testimony, instructed the jury, that it was the duty of the jury in this trial, not the duty of the prosecutor, to decide the truthfulness of the testimony. (Trial Transcript, Vol. V, at 630.) Thus, the evidence submitted was appropriate and there was sufficient legal instruction on the issue for the jury. See also United States v. Montani, 204 F.3d 761, 765 (7th Cir.2000) (holding that it was proper to allow jury to view plea agreements with cooperating witnesses). As such, there is no basis to grant a new trial.

Motion for Judgment of Acquittal
Proof of the charged Hobbs Act violation (18 U.S.C. § 1951) requires a showing that a defendant, acting under color of official right, receives payment of money to which he is not entitled, while knowing that he is not entitled to receipt of the funds and while causing the victim to make the payment with the expectation of official action. It also requires proof of some effect upon interstate commerce. See United States v. Blandford, 33 F.3d 685 (6th Cir.1994); United States v. Carmichael, 232 F.3d 510, 515 (6th Cir.2000); see also Evans v. United States, 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992); *908 United States v. Hairston, 46 F.3d 361, 365 (4th Cir.1995).
Proof of the charged bribery offense (18 U.S.C. § 666) requires a showing that a defendant is an employee of a covered program, that he solicits or accepts something of value intending to be influenced in official transactions valued at $5,000 or more, and that the program receives federal benefits in excess of $10,000 for the year of the criminal conduct. See 18 U.S.C. § 666(a)(1)(B); United States v. Mills, 140 F.3d 630, 632 (6th Cir.1998); United States v. Dakota, 188 F.3d 663, 668 (6th Cir.1999); see also Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (holding that section 666 must be interpreted in accordance with the unambiguous intent expressed by Congress).
In this case, the Motion for Judgment of Acquittal may be dispatched in short order because the proofs of guilt were overwhelming. The testimony of Veda Chapman, Nicole Jordan, Roy Crippen, the documentary evidence, the videotape, the audio tapes, and legitimate inferences from the evidence established the following: Defendant demanded and received payment of $5,000 to which he was not entitled to either as an employee of the State of Michigan or as a consultant. Defendant knew that he was not entitled to these payments and nevertheless insisted on payment as a condition for his official action. Veda Chapman agreed to make the payment for the purpose of obtaining the official action. The extortion affected interstate commerce in that the Defendant's action prevented Digital Fusion from bidding on contracts posted on the RAPHITS system and caused Digital Fusion to incur expenses and travel which would not have otherwise been incurred in the absence of the extortion. Thus, the evidence was sufficient to sustain Defendant's conviction as to Count One.
As to Count Two, the parties stipulated that the Department of Management and Budget and the contracting government agencies were recipients of federal funds of more than $10,000 for the year encompassing the charged criminal conduct. Plaintiff's proofs, especially the testimony of John Haymon, Robert Sharpley, Carolyn Later, Joseph Chin, Diane Kramer, Margaret Ann Dontje, Elaine Johnston, and Brian Smith, further established that Defendant (an employee of the Department) received large payments (in excess of $25,000) for taking actions which resulted in the award of contracts to Geysers, International and Triad Consulting (Exhibits 11-15), each valued at more than $5,000. Accordingly, the proofs support the Defendant's conviction on Count Two.

CONCLUSION
For the reasons stated, an Order shall issue denying the Motion for New Trial and Motion for Judgment of Acquittal.
Defendant has now had more than a fair chance to test the waters of contest and find them to be forbidding. Perhaps additional reflection will counsel the virtues of the admission of fault.
NOTES
[1] The contract, Exhibit 16, was not part of the charged criminal conduct in the case, but related to Rule 404(b) evidence offered against the Defendant by government witness Robert Sharpley.
[2] Defendant also made this point as to the fact that the Court warned defense counsel not to cross-examine witness John Haymon on the basis that he and the Defendant had shared prostitutes together in that this testimony would be very damaging to the Defendant. This testimony was never allowed and was never heard by the jury.
[3] Defendant has also argued on information and belief that the testimony of David Brezinski might have been helpful. However, he has no evidence, by affidavit or otherwise, to confirm that the testimony would have, in fact, assisted in the defense. Also, this testimony related to a side-issue  the Rule 404(b) evidence  and not directly to the crimes charged.
[4] With respect to the Lauer testimony and email, the Defendant appears to confuse Exhibit 12 (which contract Bost "awarded" in July 1999 after receiving a general request from Lauer) and Exhibit 14 (which contract was selected after the agency requested Triad Consultants in August 1999). The e-mail, which was dated in August, apparently relates to the second contract and would be ineffective in cross-examining the witness about her statements concerning the first contract.
[5] While the failure to introduce these exhibits caused no prejudice to the defense, the failure to offer a time-relevant version of Exhibit J (which resulted in the exclusion of the Exhibit) was itself without reasonable excuse and does represent unprofessional conduct.